STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-175

SUCCESSION OF
AUDREY MAE JOHNSON TYLER

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 39,913
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of James T. Genovese, Phyllis M. Keaty, and D. Kent Savoie, Judges.

AFFIRMED AS AMENDED.

Larry B. Minton
Attorney at Law
711 Washington Street
Post Office Box 13320
Alexandria, Louisiana 71315-3320
(318) 487-0115
Counsel for Appellant:
        Deborah Marie Esteen

**Christopher K. LaCour**
**Attorney at Law**
**3717 Government Street, Suite 11**
**Alexandria, Louisiana 71302**
**(318) 487-0210**
**Counsel for Appellee:**
**Jernell Groves**

**KEATY, Judge.**

Appellant, Deborah Marie Esteen, appeals the trial court's judgment in favor of Appellee, Jernell Groves. For the following reasons, the trial court's judgment is affirmed with respect to the distribution of the funds on deposit in the registry of the court and amended with respect to its allocation.

## FACTS & PROCEDURAL HISTORY

This matter involves the Succession of Audrey Mae Johnson Tyler. Audrey married Alvin Owen Tyler on June 9, 1956, in New Orleans. Four children were born of this marriage: Gregory O. Tyler, Dwain A. Tyler, Leslie Tyler Williams, and Melissa Tyler Chambers. This was the second marriage for both Audrey and Alvin. Deborah is Audrey's child of her first marriage, and Jernell is the child of Alvin's first marriage.

During their marriage, Alvin was a musician and earned income from music royalties. The royalties, therefore, became community property. Following Alvin's death on April 3, 1998, Audrey lived in the family home in New Orleans until 2005, when Hurricane Katrina destroyed it. She moved to Alexandria, and the destroyed home was purchased by the Road Home Corporation under a grant. In order to complete the transaction, Alvin's succession was opened on November 19, 2008. Audrey, Gregory, Dwain, Leslie, Melissa, and Jernell were joint petitioners therein. The family home was listed as a community asset in Alvin's succession. In the Judgment of Possession, Audrey was recognized as owner in her own right of an undivided one-half interest in the home. Alvin's children, Gregory, Dwain, Leslie, Melissa, and Jernell, were recognized as his heirs.

The Road Home Corporation purchased the property for $106,374.00. Alvin's one-half share of the proceeds was $53,187.00, which was divided equally between his five children, i.e., $10,637.40 per child, after Audrey relinquished her usufruct over Alvin's share of the house proceeds. There was no evidence indicating what Audrey did with her one-half share of the proceeds.

During their marriage, Audrey and Alvin maintained a joint bank account with The Fidelity Homestead Association (joint Fidelity account). Audrey was employed by the City of New Orleans during their marriage. When she retired, she received a monthly pension from the New Orleans Municipal Employees Retirement System as well as her Social Security benefits. She also received Alvin's music royalties. These funds were apparently commingled in various bank accounts over time. The testimony in the record does not provide any explanation as to what happened to those funds.

Audrey died on May 14, 2011. Audrey's succession was opened on March 22, 2012, in Rapides Parish, by attorney James Rex Fair, Jr., on behalf of Leslie Tyler Williams as administratrix. A Judgment of Possession was signed on March 23, 2012. A dispute arose regarding the proposed distributions of the assets, prompting a "Petition To Deposit Succession Proceeds In Concursus Proceeding" to be filed on June 29, 2012, on behalf of the heirs, which included Gregory, Dwain, Leslie, Melissa, and Deborah. The petition was filed by attorney Jeffery H. Thomas, who represented James Rex Fair, Jr., as the petitioner. The deposited funds totaled $475,232.93. At issue herein is the division of the remaining principal amount of $470,861.78.

On October 7, 2013, before any succession funds were distributed, Jernell filed a petition to reopen Audrey's succession. Therein, Jernell alleged that

unnamed assets listed in the concursus proceeding were not Audrey's separate assets, but remained community assets owned by Alvin and Audrey. She stated that if the assets were community property, she should be included in the distribution. Audrey's succession was reopened pursuant to a consent judgment signed on December 2, 2013. After the November 5, 2014 trial, the trial court ruled in favor of Jernell, found that the funds on deposit in the trial court's registry were community property, and ordered payment from the funds in the following percentages to: Jernell, 10%; Deborah, 10%; Gregory, 20%; Dwain, 20%; Leslie, 20%; and Melissa, 20%. A Judgment was signed on August 1, 2015, and Deborah appealed.

On appeal, Deborah asserts the following assignments of error:

I.      The trial court erred as a matter of law in failing to hold Jernell Groves, the petitioner in this case, to her burden of proving that the assets contained in the Succession of Audrey Mae Johnson Tyler were community property.

II.     The trial court erred as a matter of law in holding that all of the assets contained in the Succession of Audrey Mae Johnson Tyler were presumed to be community property due to commingling, based only upon hearsay evidence, even though the community property regime had been terminated many years before.

**DISCUSSION**

**I.    Burden of Proof**

In her first assignment of error, Deborah contends that the trial court erred as a matter of law in failing to hold Jernell to her burden of proving that the assets contained in Audrey's succession were community property. She alleges that Jernell, as the mover in this matter, had the burden of proving, by a preponderance of the evidence, that certain assets contained in Audrey's succession belonged to the former community estate between Audrey and Alvin.

3

In opposition, Jernell concedes that she was the moving party. She contends, however, that Deborah had the burden of proving the separate nature of the property brought into the property regime.

In this case, Jernell argued in her petition to reopen Audrey's succession that some, if not all, of the property was community since it was earned during Audrey and Alvin's marriage. A consent judgment reopening Audrey's succession was signed by the trial court on December 2, 2013. The trial court held that Deborah had the burden of proving at trial the separate nature of the property contained in Audrey's succession in order to overcome the community property presumption pursuant to La.Civ.Code art. 2340.

In Louisiana, "[t]he legal regime of community property is terminated by the death . . . of a spouse[.]" La.Civ.Code art. 2356. Therefore, upon Alvin's death in 1998 and termination of community, Alvin's undivided one-half interest in the former community estate was transferred to his five children, subject to the legal usufruct of Audrey. La.Civ.Code art. 890. In addition, at Alvin's death, Audrey maintained ownership of her undivided one-half interest in the former community property. La.Civ.Code art. 2336.

Then, at Audrey's death, her five children inherited her undivided one-half interest in the former community estate and any income derived from it. La.Civ.Code art. 888. In addition, Audrey's usufruct over Alvin's undivided one-half interest in the former community estate terminated at Audrey's death, entitling Alvin's five children to an accounting and the return of their undivided one-half interest in any former community assets, as well as their undivided one-half interest in any income derived from former community assets. La.Civ.Code arts. 890 and 535-549.

4

As such, there is no presumption in this case that the funds in Audrey's possession at her death, fourteen years following Alvin's death, were either former community assets or income derived from community assets. The trial court committed legal error in imposing the presumption of community since the community property regime terminated in 1998. Errors and questions of law are to be reviewed under the de novo standard of review. *Land v. Vidrine*, 10-1342 (La. 3/15/11), 62 So.3d 36. Using the de novo standard of review, we will identify what assets comprised the former community estate, and the extent of which those assets comprised the funds in Audrey's possession at her death.

## II.    Classification of Assets

There is no evidence tracing the source of the funds deposited into the registry of the trial court other than that they were in Audrey's possession at her death. With the exception of Audrey's separate interest in 50% of the Road Home proceeds, however, we find there is sufficient evidence establishing that the funds in the trial court's registry were either part of the former community estate or income derived from the former community assets.

### A.    $10,000.00 & Joint Fidelity Account

It is undisputed that Audrey and Alvin maintained a joint Fidelity account which contained $71,970.29 on the date of his death. It is also undisputed that a balance of $59,166.42 remained following deductions alleged to have been made for Alvin's funeral costs, and that a lump sum payment of $10,000.00 was distributed to Alvin's five heirs and Deborah in 2006. The issue is whether the lump sum payment originated from the joint Fidelity account or another account. Jernell claims that the lump sum payment originated from a different account and that an additional $71,970.29 in community property funds remains unaccounted

for and undistributed. Deborah contends that the lump sum was paid from the joint Fidelity account and distributed to the heirs in 2006.

At trial, Dwain testified on Jernell's behalf. On direct examination, he recalled receiving a $10,000.00 check from Audrey in 2006. Dwain stated that the money came from funds left by Alvin upon his death. He remembered that prior to Alvin's death, his father said that he "had put aside I think seventy thousand dollars . . . to be . . . disbursed between his . . . six children." Dwain could not remember which account the money came from. He stated that his parents maintained a joint Fidelity account, "but they also both had separate accounts." Dwain did not recall the amount of money remaining in the joint Fidelity account at the time of Alvin's death, although he did not dispute that $71,970.29 remained. When asked whether Audrey closed all of her accounts with Fidelity or whether she always maintained an account with Fidelity, Dwain responded: "[A]s far as I know of she always had one." Dwain testified that he did not know where Alvin stored the $71,970.29. On cross-examination, Dwain stated that each heir received $10,000.00 in 2006. On direct examination and cross-examination on rebuttal, Dwain could not definitively say whether the lump sum paid in 2006 came from the joint Fidelity account.

Jernell also testified at trial. On direct examination, she agreed with Dwain that she received $10,000.00 from Audrey in 2006. She stated that her sister, Melissa, informed her about the money while Alvin was in the hospital. Jernell could not recall whether the money came from the joint Fidelity account or another account.

Melissa testified on Deborah's behalf. On direct examination, Melissa stated that she was the administratrix of Audrey's estate. She testified that Alvin

and Audrey maintained a joint Fidelity account although she was unaware of whether they had separate accounts. Melissa stated: "There was a joint account[,] and there was an account that was just my mother's, uh, checking account." When Melissa was asked "what went into that account[,]" she responded that it contained Audrey's Social Security and retirement benefits, along with " . . . disability retirement then [sic] my father was alive." Melissa stated that when Alvin died, the joint Fidelity account contained $71,970.29. She testified that $10,000.00 and $2,803.87 was thereafter deducted from that account to pay for Alvin's funeral and for the opening and closing of his grave respectively. Deborah's counsel noted that the remaining balance of $59,166.42 was less than the $60,000.00 needed for Audrey to disburse $10,000.00 to the six children. When asked to explain this discrepancy, Melissa revealed that Audrey wrote the lump sum checks from the joint Fidelity account with the remaining money coming from Audrey's funds.

On cross-examination, Melissa again said that the lump sum came from the joint Fidelity account. When asked, "if she paid out the [joint Fidelity] account, how is it that at the time of her death she still had a savings account with Fidelity in the amount of a hundred and twenty-one thousand if she paid out sixty from that account?" Melissa responded that Audrey was receiving music royalties from Broadcast Music, Inc. (BMI) and the American Federation of Musicians. According to Melissa's testimony, Audrey also received money from pensions, Social Security, and deductibles from annuities. Melissa could not prove from which fund the lump sum was paid. Melissa agreed that Dwain took care of Audrey following Alvin's death. When asked whether Melissa doubted Dwain's testimony that their parents maintained separate accounts, she said: "If there is a

separate account, it would be in my father's name." Melissa did not have personal knowledge as to where or what account Audrey drew the funds for the 2006 lump sum payment.

Based on the above, we find that the former community estate included the joint Fidelity account with a balance of $71,970.29. Even though a lump sum payment of $10,000.00 was disbursed to each of Alvin and Audrey's four children as well as to each of their separate children in 2006, it remains unclear as to the source of the money, i.e., from the joint Fidelity account or a separate account.

### B. Retirement

Audrey's retirement benefits were another issue discussed at trial. In Louisiana, "a former spouse is entitled to a pro rata share of the retirement benefits of a member spouse to the extent the retirement benefits were attributable to the former community." *Bordes v. Bordes*, 98-1004, p. 3 (La. 4/13/99), 730 So.2d 443, 445. On the other hand, disability benefits under a policy purchased with community funds are generally considered separate property. *Id*. Social Security disability benefits are also considered separate property. *Young v. Young*, 06-77 (La.App. 3 Cir. 5/31/06), 931 So.2d 541. Deborah's counsel argued at trial that Audrey's retirement benefits were disability benefits and, therefore, separate property.

In support, Melissa testified on direct examination that Audrey worked for the City of New Orleans. Melissa said that Audrey retired in the late 1980s or early 1990s after she was hit and injured by a city van. She indicated that as a result, Audrey began receiving monthly disability retirement benefits in the amount of $342.00, which payments ceased upon her death.

8

On cross-examination, Melissa agreed that Audrey retired before Alvin died and that she received retirement benefits before his death. Melissa, however, was unable to specify whether her retirement benefits were considered disability benefits, based upon the following colloquy:

> Q. Okay. And you, you're calling the retirement disability retirement, but do you have any documentation to show that that retirement is due to disability or that she just (interrupted)[?]
>
> A. It's, it's from her employment.
>
> Q. Okay. During the marriage?
>
> A. During the marriage.
>
> Q. So wouldn't that make her retirement community property?
>
> A. I believe it was community property but I also believe that it was, um, deposited into that seventy-one thousand dollar account.

This confusion was compounded by Melissa's testimony that Audrey received "her pension from her job" and "disability from Social Security." Melissa, however, had no documentation showing that Audrey's retirement resulted from a disability. She further testified that Audrey deposited her Social Security and retirement checks in her separate Fidelity checking account.

Jernell testified that Audrey worked for the City of New Orleans during the marriage and retired before Alvin died. She stated that any retirement Audrey earned was earned during the marriage. Dwain testified that he cared for Audrey from 2000 to 2011. He was unsure whether Audrey was receiving retirement funds from her job. Dwain stated, however, that Audrey was receiving Social Security disability benefits. When asked whether he "[c]ould . . . say whether or not the retirement was just that her receiving her retirement benefit[,]" he responded that he "ha[d] no knowledge to that."

There is no indication in the record as to whether the benefits are retirement pension or disability benefits. The documents indicate that the benefits began following Alvin's death given the January 1, 2000 start date. However, Melissa testified that Audrey was receiving her "retirement benefits" before he died. Accordingly, it is reasonable to find that Audrey's retirement pension was earned during the marriage and was not disability benefits. During Audrey's lifetime, she was paid at least $57,500.00 from her retirement account. It is unclear what happened to these funds, but they were formerly community property.

Social Security benefits were another issue at trial. Generally, Social Security payments are considered separate property. *See Young*, 931 So.2d 541. Melissa, who testified on behalf of Deborah, stated that Audrey's Social Security payments were directly deposited into Audrey's Fidelity checking account. Deborah did not provide any other evidence or additional witness testimony that would have identified the source of the funds. This includes, but is not limited to, evidence showing when Audrey started receiving Social Security benefits and the amount she received over her lifetime. The Social Security funds have been commingled to such an extent that it is impossible to trace its origin. The Social Security benefits are, therefore, part of the former community property.

### C. Music Royalties

At trial, it was stipulated that Alvin was a successful musician who wrote, played, and recorded music. It was further stipulated that he received royalties from his music. Melissa testified on cross-examination that in 2006, Audrey's separate Fidelity savings account had double the money because she was receiving music royalties from the American Federation of Musicians Pension Fund in the amount of $61.65 per month. However, more information is needed to determine

10

the separate nature of any music benefits, such as when Audrey began receiving the benefits and what account(s) it was deposited into. The music royalties are, therefore, part of the former community property.

### D. Funeral Amounts

At trial, it was stipulated that Audrey and Alvin maintained a joint Fidelity account containing $71,970.29. After Alvin's death, two deductions were made totaling $12,803.87. The issue at trial was whether those deductions would be Alvin's separate debts that would come out of that account and not be part of Audrey's estate.

In support, Deborah's counsel introduced into evidence the joint Fidelity account passbook which shows credits and debits. Melissa testified that $10,000.00 was deducted on April 8, 1998, to pay for Alvin's funeral. She stated that an additional $2,803.87 was deducted on May 26, 1998, for the opening and closing of Alvin's grave. The passbook shows these deductions. Deborah provided no documentary evidence, however, specifically showing that these deductions related to Alvin's funeral expenses. Thus, the trial court was not bound to consider the alleged funeral expenses of Alvin when calculating what Audrey's estate owed to Jernell.

## II. Distribution

Pursuant to the above evidence, at Alvin's death, the former community estate included: (1) the community home, (2) the joint Fidelity account, (3) Audrey's retirement benefits, and (4) Alvin's royalties. There was no evidence that Audrey had any separate assets at Alvin's death. There was also no evidence suggesting that, after Alvin's death, Audrey received any income other than that

11

deriving from Audrey's retirement benefits and Alvin's royalties, both of which were former community assets.

Upon Audrey's death and termination of the usufruct, Alvin's five children obtained full ownership of Alvin's undivided one-half interest in both the former community estate and income derived from the former community assets. Similarly, Audrey's five children inherited Audrey's undivided one-half interest.

With respect to the Road Home proceeds, Audrey gave up her usufructuary interest in Alvin's 50% interest in those proceeds and distributed that interest equally among Alvin's five children. There is no indication that she spent her 50% ownership interest in those funds prior to her death. Therefore, Audrey's five children would each be entitled to 20% of Audrey's $53,187.00 from the sale of the community home.

The distribution of the $470,861.78 in the trial court's registry is as follows: Gregory, Dwain, Leslie, and Melissa each receive $94,172.34; Deborah receives $52,404.87; and Jernell receives $41,767.47, based on the following: Audrey's five children, Gregory, Dwain, Leslie, Melissa, and Deborah, each receive 20% of Audrey's $53,187.00 interest in Road Home proceeds, i.e., $10,637.40 each. As to the remaining $417,674.78 in the trial court's registry after subtracting the Road Home proceeds, Audrey's five children receive 20% of Audrey's one-half interest in that amount, or $41,767.47 each. In addition, Alvin's five children, Gregory, Dwain, Leslie, Melissa, and Jernell, receive 20% of Alvin's one-half interest, over which Audrey was the usufructuary prior to her death, or $41,767.47 each.

## III. Hearsay

In her second assignment of error, Deborah contends that the trial court erred as a matter of law in holding that all of the assets contained in Audrey's succession

were presumed to be community property due to commingling, based only upon hearsay evidence, even though the community property regime had been terminated many years before.

This court in *Taunton v. Cane Air, Inc.*, 405 So.2d 624, 626 (La.App. 3 Cir. 1981), discussed hearsay evidence as follows:

> It is well settled that failure to object to hearsay or secondary evidence when admitted at trial constitutes a waiver of the right to object to its admissibility and that such evidence may then be considered and given probative effect. The aggrieved party may not subsequently on appeal urge that such evidence was not actually admissible.

In this case, both Jernell's counsel and Deborah's counsel elicited hearsay testimony from the witnesses who testified. Neither Jernell's counsel nor Deborah's counsel raised any hearsay objections. Thus, Deborah's counsel "may not subsequently on appeal urge that such evidence was not actually admissible." *Taunton*, 405 So.2d at 626. Deborah's second assignment of error, therefore, is without merit.

## DECREE

The trial court's judgment in favor of Appellee, Jernell Groves, is amended with respect to the distribution of the $470,861.78 in the trial court's registry in that the allocation of the funds shall be as follows: Gregory, Dwain, Leslie, and Melissa each receive $94,172.34; Deborah receives $52,404.87; and Jernell receives $41,767.47. The judgment is affirmed as amended. All costs associated with this appeal shall be assessed equally between Appellant, Deborah Marie Esteen, and Appellee, Jernell Groves.

**AFFIRMED AS AMENDED.**